**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**(PIKEVILLE)**

| | |
|---|---|
| BLACKJEWEL LIQUIDATION TRUST, LLC by and through DAVID J. BECKMAN, TRUSTEE, *Plaintiff*, | Case No. 7:23-cv-00097-REW-EBA |
| v. | |
| JAVELIN GLOBAL COMMODITIES (US) LP, *et al.*, *Defendants*. | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

Defendants Javelin Global Commodities (US), L.P.'s and Black Mountain Marketing & Sales, L.P.'s ("Defendants") Memorandum in Support of their Motion for Summary Judgment (ECF No. 50-1 ("Mot.")) mischaracterizes Kentucky law and relies on a self-serving, cherry-picked recitation of the facts in the hopes of convincing the Court that they are entitled to summary judgment. The Court should reject Defendants' unfounded assertions. Not only did Plaintiff not "ignore[] the actual claim it had pled," discovery, in the form of Defendants' own emails and text messages, has revealed the extent to which Defendants conspired to take complete control of INMET Mining, LLC ("INMET") and tortiously interfere with the Royalty Agreements between Plaintiff and INMET. Moreover, and contrary to Defendants' assertions that they had no interest in owning INMET's assets, discovery has shown that for years, Defendants were scheming to eliminate the "run with the land language" and acquire INMET's Lone Mountain and Black Mountain assets.

Similarly, Defendants repeatedly mischaracterize the testimony of INMET's former Chief Executive Officer, Hunter Hobson, regarding the Defendants' tortious scheme, how they rendered

him powerless, and controlled and manipulated the information he shared with his business partners and Plaintiff. Mr. Hobson also acknowledged that Defendants exercised such complete control over INMET that he was not permitted to pay obligations as they came due, including the payments owed to Plaintiff, without their permission, and that Defendants refused to let him do so. Moreover, Mr. Hobson did not dispute Mr. Beckman's testimony that the Defendants did not allow him to provide Plaintiff with financial information required under the Royalty Agreements.

Ultimately, far from supporting summary judgment, discovery has revealed the scope of Defendants' tortious interference with Blackjewel's contractual relationship with INMET, which began before the Royalty Agreements were even signed. And it only increased after the Royalty Agreements were approved by the United States Bankruptcy Court. What followed was a multi-year campaign of manipulation, saddling INMET with highly questionable debt, scheming regarding ways to eliminate the payment obligations under the Royalty Agreements, repeatedly encouraging INMET's principals to mislead and withhold critical information from Plaintiff, seizing control of INMET, and using the bankruptcy process to force INMET to argue against the "run with the land" language that INMET expressly agreed to, thereby causing millions of dollars in damages. Accordingly, the Motion should be denied in its entirety.

## FACTUAL BACKGROUND

### A. INMET Acquires Certain of The Blackjewel Debtors Assets Out of the Blackjewel Bankruptcy.

On July 1, 2019, the Blackjewel Debtors filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of West Virgina. *See In re: Blackjewel LLC.,* 3:19-bk-30289 (S.D.W.Va.) (the "Blackjewel Bankruptcy") at ECF No. 1. Shortly before the bankruptcy filing, David J. Beckman and FTI Consulting were retained by the Blackjewel Debtors to "try to resolve [Blackjewel's] cash needs… and then negotiate, along with [Jeff] Hoops

[Blackjewel's Chief Executive Officer], with [Blackjewel's] senior creditors about how much money [it] really needed and what [it] [was] going to do with it and how quickly [it] [was] going to restructure the business." Deposition of D. Beckman (**Ex. 1**) at 29:5-14. Mr. Beckman was subsequently appointed Blackjewel's Chief Restructuring Officer and later became Interim CEO, after Mr. Hoops was removed. *Id*. at 33:21-34:14.

In late July and early August 2019, Mr. Beckman, the Blackjewel Debtors' counsel, and the Blackjewel Debtors' financial advisor (Jerrod Freund of Jefferies Finance LLC), held a bankruptcy auction to sell the Blackjewel Debtors' assets to maximize value for their estates. *Id*. at 57:23-60:16. Mr. Freund was responsible for "***guiding the company from a sale perspective***." *Id*. at 49:5-50:6 (emphasis added). To ensure that only serious bidders participated, Mr. Freund advised potential bidders "that the minimum price of entry was" $5 million. *Id*. at 57:23-60:13. During the auction process, bidders used royalty streams to make their bids more competitive. *Id*.

The Blackjewel Debtors' position, communicated through Mr. Beckman and its various advisors, was always clear that any royalty obligations included with a bid must "run with the land." *Id.* at 71:7-77:1. This position was specifically communicated to INMET, INMET's counsel, and Mr. Sloan,[1] who was "working with" Mr. Hobson "in support of [his] bid" at the auction. *Id*. at 65:20-67:13. During the auction process, Mr. Freund advised Mr. Hobson that INMET's bid would be more competitive by adding "additional royalty" payments. **Ex. 2** at HOBSON 01437. As a result, INMET augmented its bid to include future royalty payments. **Ex. 1** at 66:8-68:5. At the auction, Mr. Beckman got the sense that Mr. Sloan did not want the royalty obligations to run with the land. *Id*. at 76:4-16.

[1] Mr. Sloan, Javelin's President and Chief Investment Officer, was present at the bankruptcy auction.

Ultimately, INMET was declared the winner of the Black Mountain and Lone Mountain assets at the auction. It agreed to pay the Blackjewel Debtors $6 million in up-front cash and $16.4 million over the course of six years in royalty payments, to reimburse the Blackjewel Debtors for certain expenses incurred in maintaining the operations INMET was purchasing, and INMET agreed that the royalty obligations would "run with the land." Blackjewel Bankruptcy at ECF No. 1096 at 6, 111-12, and 138.[2]

### B. Before the Royalty Agreements Were Finalized, Defendants Began Interfering.

Before the Royalty Agreements were finalized, Defendants began interfering with the impending contractual relationship between INMET and the Blackjewel Debtors. Specifically, on August 5, 2019, Mr. Sloan of Javelin provided INMET's counsel with "comments on the Royalty." **Ex. 5** at D290.[3] These comments sought to subvert the "run with the land" language, which INMET and the Blackjewel Debtors had agreed to. *Id.* at D298. When Plaintiff rejected the changes, Mr. Sloan protested that he did not want to "tak[e] any risk that Riverstone [the secured lender to the Blackjewel Debtors pre-bankruptcy] tries to claim they are secured or there [*sic*] royalty payments survive bankruptcy." **Ex. 6** at D1419. Mr. Sloan admitted that Defendants did not want to include this language because they were "doing contingency planning for a potential bankruptcy ***and [their] desire was to ensure that any royalty payments would not survive a subsequent bankruptcy.***" Deposition of S. Sloan (**Ex. 7**) at 68:18-24 (emphasis added).

On September 7, 2019, after extensive negotiations, and despite Defendants' attempts to excise the "run with the land" provisions, INMET executed the Royalty Agreements, which

---

[2] There are two royalty agreements at issue in this case, both of which are attached hereto as Exhibit 3 (the "Fixed Royalty Agreement") and Exhibit 4 (the "Employee Royalty Agreement"). They are collectively referred to herein as the "Royalty Agreements."

[3] For ease of reference, pin cites to documents produced by Defendants in discovery will be cited as "D____," omitting the 0s before the Bates number. Documents with the Bates stamp "HOBSON" were produced by Mr. Hobson to Defendants in a different action, then produced by Defendants to Plaintiff in this action.

provided, in pertinent part, that the royalty interests "***shall run with the land and be binding upon the successors and assigns of Grantor as owners of any of the land or real property interests with respect to the Purchase Mines… and shall inure to the benefit of Grantee and its successors and assigns***." **Ex. 3** at 1-2; **Ex. 4** at 2.

The Fixed Royalty Agreement obligated INMET to pay an amount "equal to the aggregate net present value [] of $9,100,000," which required INMET to pay the Trust "$2,738,092 for each year during the period beginning on [September 7, 2019] and ending on the date that is six (6) years after [September 7, 2019]." **Ex. 3** at 1-2. The Employee Royalty Agreement required INEMT to pay the Trust an amount "equal to $0.25 per ton of coal mined from the Purchased Mines up to an aggregate total of $550,000." **Ex. 4** at 1-2. Under both agreements, INMET was required to provide the Trust with "a report setting forth the gross production and fair market value of the operation" "[w]ithin forty-five days following the end of each calendar quarter until the Royalty has been paid in full." **Ex. 3** at 2; **Ex. 4** at 2.

### C. Defendants and INMET Enter Into A Series Of One-Sided Agreements.

In August and September of 2019, INMET and Defendants began finalizing their own contractual arrangement.[4] During these "negotiations," Defendants presented their preferred contractual terms on "a take-it or leave-it" basis, Deposition of H. Hobson Vol. I (**Ex. 8**) at 86:6-18, and Defendants were not "willing to negotiate key commercial terms." **Ex. 9** at D96293. INMET felt it had no choice but to accept the Defendants' commercially unreasonable terms, including that Defendants would serve as their "exclusive" marketing agent. *Id.*; *see also* **Ex. 8** at

[4] INMET and Kopper Glo Mining LLC ("Kopper Glo") were sister companies. **Ex. 8** at 41:13-42:23. Mr. Hobson was the Chief Executive Officer of both companies. *Id.* INMET was formed in or about August of 2019 to acquire and hold the assets purchased from the Blackjewel Debtors at the bankruptcy auction, Lone Mountain and Black Mountain. *Id.* at 72:1-11. BMMS had identical contractual relationships with both INMET and Kopper Glo.

81:20-93:3. Importantly, while Defendants were negotiating their contractual relationship with INMET, they knew that INMET was "thinly capitalized." **Ex. 10** at D71021.

On September 18, 2019, INMET and BMMS executed a Coal Marketing Agreement, which appointed BMMS to "***serve as the exclusive marketing agent and sales representative***" for INMET for a 15-year term "with respect to both domestic sales and exports of the Coal from the United States." **Ex. 11** at D6503 (emphasis added). The parties also executed a Master Coal Purchase and Sale Agreement which appointed BMMS "***as the exclusive offtaker and purchaser of coal from the Mines***." **Ex. 12** at D6539 (emphasis added). The Amendment to Master Coal Purchase and Sale Agreement permitted BMMS to make certain advanced payments for coal to INMET subject to INMET paying BMMS "a fee equal to the Advance Payment Balance outstanding… multiplied by the Daily Interest Rate and multiplied by the number of days elapsed…"[5] **Ex. 13** at D6584. In addition, the Prepaid Purchase Agreement Confirmation entitled BMMS to a discount based on the $5 million it loaned INMET to purchase the Black Mountain and Lone Mountain assets. **Ex. 14** at D6569-70.

INMET's obligations to BMMS were secured by the collateral of Industrial Minerals Group, LLC ("IMG"), INMET's parent company, including INMET's and Kopper Glo's assets. *See* **Exs. 15** at D5786, **16** at D6525-26, and **17**. Defendants also obtained personal guaranties from Mr. Hobson, Keith Dyke, and Corbin Robertson, III, IMG's owners. **Ex. 18** at D6605-14. These agreements gave the Defendants significant leverage and virtual total control over INMET, its cash flow, and its principals. **Ex. 8** at 87:19-90:6; Deposition of K. Dyke (**Ex. 19**) at 25:2-27:1. Under these agreements, Defendants made money on nearly every aspect of its relationship with INMET. Deposition of P. Pritchard (**Ex. 20**) at 37:8-41:5. And the exclusive nature of the relationship also

[5] The Daily Interest Rate, as set forth in the Amendment to Master Coal Purchase and Sale Agreement, the "three-month LIBOR" rate "plus 8% divided by 360 days." *Id.* at D6595.

rendered INMET "beholden to Javelin" because it "didn't have any other options in the market." **Ex. 8** at 80:20-82:16.

### D. Defendants' Lack Of Performance Weakens INMET's Financial Position.

Shortly after INMET and BMMS executed their various agreements, Mr. Hobson began raising concerns about BMMS's marketing and sales efforts. For example, on October 18, 2019, Mr. Hobson emailed Peter Pritchard, a Vice President at Javelin, that INMET, despite starting operations, did not "have enough sales to run th[e] operations much past January/February of" 2020. **Ex. 21** at D7941. On October 24, 2019, Mr. Hobson again raised concerns that INMET was "undersold," and did "not have the sales to support the current production mix [it] [had] on the ground and planned." **Ex. 22** at D8295. Then, on October 31, 2019, Mr. Hobson again raised "concerns" that anticipated sales were far less than INMET's production volume. **Ex. 23** at D8810-11. In addition, the sales arranged by Defendants "***[were going to] be below cost at INMET***," which made "***the working capital position more strained.***" *Id.* at D8810 (emphasis added). However, because Defendants charged INMET a marketing fee regardless, they made money even if INMET sold below cost. **Ex. 20** at 40:18-41:5.

Importantly, in August of 2019, months before these issues arose, Mr. Pritchard raised the same concerns with Defendants' senior management. **Ex. 24** at D94286-91; *see also* **Ex. 20** at 59:12-62:4. In response, Mr. Pritchard was told to "stop being a ponse"[6] and Defendants' senior management discussed betting wine on whether INMET would "go bust in the first 6 months." **Ex. 24** at D94287-88. Mr. Bradley, Javelin's Chief Executive Officer, was not concerned with whether INMET would "go bust" because Defendants were "well positioned" and would "earn

[6] The Cambridge Dictionary defines "ponce" as "a man who does not behave, dress, or speak in a traditional male way, especially one who behaves in a very careful way[.]" *See* https://dictionary.cambridge.org/us/dictionary/english/ponce (last visited July 30, 2025).

enough money out of Bjms to cover the episode." *Id.* at D94288.

### E. Defendants Begin Taking Control of INMET and Plotting For a Default.

In May of 2020, Mr. Hobson felt "like the existing agreements with Javelin and BMMS made it a challenge for [him] to run" INMET. Deposition of H. Hobson Vol. II (**Ex. 25**) at 177:14-22. In fact, with those agreements in place, he did not see "any way that [he] could [have] salvage[d]" INMET. *Id.* Thus, on May 22, 2020, INMET's counsel made a proposal to revise Defendants' and INMET's existing relationship. **Ex. 26** at D21384-85.

On May 23, 2020, after receiving this proposal, Mr. Sloan stated that he "***want[ed] to put hunter into default on the prepay and call the [personal] guarantee ASAP***" and asked another Javelin employee to "think through a good way to do this." **Ex. 27** at D94688 (emphasis added). Consistent with this scheme, on May 25, 2020, Defendants began sending INMET invoices seeking nearly $1 million in interest and questionable third-party fees. **Ex. 7** at 162:16-176:20; *see also* **Ex. 28** at D21399-402; **Ex. 29** at D21428-33; **Ex.** 8 at 112:1-114:19. This barrage of invoices was no accident; it was part of Defendants' plan to "put hunter into default on the prepay and call the [personal] guarantee ASAP." **Ex. 27** at D94688. Indeed, Mr. Sloan demanded that Defendants "***inundate [INMET] with invoices***," even if they were "***debatable***," knowing that INMET would be unable to comply "and breach the contract." **Ex. 31** at D74862 (emphases added). This was only one part of Defendants' multistep "plan" to place overwhelming leverage on INMET and its management. **Ex. 32** at D91192-93.

On May 27, 2020, Defendants' plans for forcing a default, even if INMET cured, were laid out in detail:

> 1. Send default notice for failure to pay interest due under the prepayment first thing tomorrow; if they fail to cure, we can declare an event of default on Thursday, June 4th
> 2. Send revised tracker on Friday which shows payment due under the Sears invoices with payment due on June 4th per the invoices already sent.

> If they have not cured the default on interest, we call a Repayment Event under the WC facility and accelerate amounts due under the prepayment. ***If they do cure the interest we'll be prepared to:***
> 1. Send notice of default for failure to pay the Sears fees (if unpaid)
> 2. Send updated tracker holding back the value of the prepay while releasing Holdback of the rail costs and invoicing for payment

*Id.* (emphasis added). On June 8, 2020, BMMS "declare[d] the Pre-Payment Balance" of $5 million "due and payable" and informed Messrs. Hobson, Dyke, and Robertson that they were calling their personal guaranties. **Ex. 30** at D22290-91.

While Defendants were scheming, Hobson was pleading with Mr. Sloan to restructure the parties' contractual relationship. **Ex. 33** at D21446-47. Defendants rejected Hobson's proposal, despite having largely orchestrated INMET's financial woes. *Id.* at D21446-48. Defendants also saddled INMET with questionable charges that it could not reconcile and made calculation errors that caused INMET to borrow at a higher rate than normal. *Id.* at D21446-47.

Mr. Hobson also complained that large demurrage[7] charges that Defendants assessed were hurting INMET and that INMET lacked visibility into these charges. *Id.* In fact, in November of 2021, Hobson complained to Mr. Freund of Javelin that INMET "would have a whole lot more funds available and not have to draw down on th[e] line [of credit], if [he] could get an answer on the $3 million worth of holdbacks [Defendants] [had] on [INMET] for demurrage charges." **Ex. 34** at HOBSON 01629. Mr. Freund responded that the "***[f]ucking demurrage is insane***" and called it "***bullshit.***" *Id.* (emphasis added). Ultimately, Defendants charged INMET tens of millions of dollars for demurrage and other questionable fees. *Id.* *See* **Ex. 35**[8] (Ancillary Costs tab). When

[7] Demurrage is a penalty paid for failing to load or unload a material carrier within the timeframe set out in the contract. Although INMET had no control over how or whether coal from its mines were loaded or unloaded timely, these charges were passed through to INMET.
[8] A native version of this Excel spreadsheet will be provided to the Court.

Mr. Hobson questioned these fees and sought supporting documentation, Defendants ignored his concerns and requests. **Ex. 8** at 110:18-113:21.

The Defendants' strategy of forcing breaches of the agreements also caused the various agreements' default interest provisions to take effect. Deposition of J. Freund (**Ex. 36**) at 332:15-333:10. This resulted in INMET being charged higher interest rates, further tightening Defendants' financial stranglehold on INMET. *Id.*; **Ex. 8** at 101:14-102:14 (Hobson testifying that as the debt level increased, so did the "level of control [Defendants] had over INMET"); **Ex. 25** at 153:18-156:9 (Hobson testifying that "the buildup of [INMET's] debt to th[e] hundred million dollar figure was a way for BMMS and Javelin to take [INMET] from [him]").

### F. Defendants Use the Personal Guaranties To Control INMET.

Defendants used the specter of the personal guaranties as leverage to restructure INMET so that it was easier to control. Indeed, Defendants' strategy was to push Messrs. Dyke and Robertson, III out of IMG because one individual—Mr. Hobson—was easier to control than three. To do this, Defendants offered to abstain from enforcing the personal guaranty against Mr. Dyke in exchange for him "sell[ing] 100% of his equity in [Kopper Glo and INMET] for $1." **Ex. 37** at D74966; **Ex. 38** at D23041. Mr. Hobson was then going to "grant Javelin warrants over 51% of the equity in [Kopper Glo and InMet] for $1, exercisable at any time." *Id.* Importantly, during these negotiations, Defendants controlled what information Mr. Hobson and the other IMG principals were permitted to share with each other and staged various scripted phone calls to get what they wanted out of the negotiations. **Ex. 39** at D97018. Moreover, they threatened adverse consequences for each counterparty if they shared their discussions with Defendants with one another. **Ex. 40** at D97136-41.

On July 31, 2020, Defendants and Messrs. Hobson and Dyke entered into a series of agreements that memorialized this deal. Specifically, Mr. Dyke "irrevocably and unconditionally"

transferred his interests in IMG to Hobson and withdrew from IMG. **Ex. 41** at D25685. Under the revised personal guaranty, BMMS agreed to "abstain from enforcing any of its rights against [Mr.] Dyke pursuant to the" personal guaranty "dated as of September 18, 2019" in exchange for Mr. Dyke's execution of the Assignment and Assumption Agreement. **Ex. 42** at D25767. For Mr. Hobson, however, the revised personal guaranty remained "in full force and effect unmodified". *Id*. at D257868. This meant that Defendants could continue to maintain their control over Mr. Hobson. And, finally, Defendants forced Mr. Hobson to execute the Limited Liability Company Agreement of INMET Mining, LLC, which gave BMMS an income interest in INMET. **Ex. 43** at D25713. This agreement also made Mr. Hobson INMET's Chief Executive Officer and sole manager. *Id*. at D25719 and D25725.

Defendants' use of leverage worked, and they controlled Mr. Hobson and INMET to such a great extent that INMET could not even make independent decisions regarding normal business expenditures without Defendants' approval. **Ex. 8** at 21:2-11:3 (Mr. Hobson testifying that Defendants' approval was required "***before INMET made any large expenditures***" and to determine "***what debts would be paid by***" INMET); *see also* **Ex. 25** at 259:9-260:12 (Mr. Hobson testifying that he "***talked every Tuesday with Javelin and presented [it] with literally every dollar [INMET] [was] going to spend in a given week and who it was going to" and that Defendants had "to approve those disbursements***") (emphasis added). And, as early as August of 2020, Javelin was plotting ways to acquire INMET's valuable assets, including Black Mountain and Loan Mountain, and be "**free and clear from [the] royalty**" obligations. **Ex. 44** at D97436 (emphasis added).

Defendants' representatives, including Mr. Sloan, frequently directed Hobson regarding what information should and should not be communicated to third parties, like Plaintiff, and what

he should and should not say. **Ex. 8** at 114:10-116:18; **Ex. 40** at D97134-35 (instructing Mr. Hobson to get "a deal done with Riverstone and Debtors" by getting "an agreement to settle 100% of the total royalty for $[1.5]mm" but that "***nobody can know that [Defendants] are involved***") (emphasis added); **Ex. 45** at D25251-52 (advising that Hobson tell a royalty holder that INMET was going to file for bankruptcy in July 2020 because that is "the same style of approach we [were] taking with DB [Mr. Beckman] as well.").

Defendants also had no problem forcing INMET to spend money on things that they believed furthered their own financial interests. For example, in August of 2020, Defendants forced INMET to hire Mr. Freund—who now worked at Javelin[9]—to provide INMET "with consulting services, including advice and assistance in connection with a possible sale or restructuring transaction," which cost INMET at least $1.5 million. **Ex. 46** at D82796. And, as discussed more fully below, Defendants also forced INMET to hire Weir Resources, LLC ("Weir") for $1 million per year. **Ex. 47** at D88371-72.

In August of 2020—immediately after Defendants forced INMET to restructure—they again began discussing INMET's potential bankruptcy. Indeed, Mr. Freund stated that Defendants "***need[ed] to acquire [Black Mountain] and [Lone Mountain] from***" INMET, let it retain $3 million so that it could file for bankruptcy, then Defendants would be "free and clear from the royalty…" **Ex. 44** at D97436. Mr. Freund also stated that this plan would not be possible with Mr. Hobson running INMET. *Id.* at D97435.

---

[9] Javelin covertly hired Mr. Freund who had been serving as the Blackjewel Debtors' financial advisor while at Jefferies. **Ex. 36** at 50:14-20. And so it was that one of the advisors that helped the Blackjewel Debtors negotiate the Royalty Agreements, including the "run with the land" language, began acting against the Blackjewel Debtors by attempting to undermine the same agreements that he had helped negotiate.

Defendants' Motion contends that they acted benevolently by loaning INMET over $62 million for prepayments (excluding interest), and that they could have taken INMET over much earlier, if that was their goal. Mot. at 3. The evidence here tells a different story. In 2020 and 2021, INMET was in a dispute with Natural Resource Partners L.P. ("NRP"), which owned much of the land that INMET mined. **Ex. 48** at D24364-65. Corbin Robertson, Jr., the CEO and Chairman of NRP's Board, is the father of Mr. Robertson, III, Mr. Hobson's business partner and co-guarantor of INMET's debt. **Ex. 49** at D77114-16. Defendants' plan to gain leverage in this dispute was to "***[r]un up the prepay [debt]***," take Mr. Robinson, III "to court to extinguish debt," and then "[n]egotiate [a] lease [deal] in return for some. . . debt forgiveness[.]" *Id.* at D77115-16. This strategy had the added benefit of letting Defendants credit bid on INMET's assets in 2023 after the INMET debt had been "run up."

### G. Defendants Begin Positioning INMET For Bankruptcy as Part of Their Scheme.

In June of 2022, Defendants continued to advance their scheme to acquire INMET's assets by forcing it into bankruptcy. As part of that plan, Defendants forced INMET to hire Weir to "provide management services and help implement strategies, procedures and business plans relative to improving company performance…" **Ex. 47** at D88371. Under this consulting agreement, INMET paid Weir a $1 million annual fee. *Id*. at D88372. Demonstrating Defendants' level of control, INMET was not allowed to terminate the Weir contract "***without the prior written consent of BMMS***." *Id.* at D88374 (emphasis added). On December 31, 2022, INMET, with BMMS's consent, terminated the consulting agreement. **Ex. 50** at D88377. However, on January 1, 2023, Weir and Bailey & Glasser, LLP—Defendants' counsel—entered into an agreement pursuant to which Weir was "***to provide engineering, operational and financial management [in]***

***support [of] Javelin's consideration of a possible acquisition of certain of INMET's existing and planned underground and surface mining operations***." **Ex. 51** at D88362 (emphasis added).

Far from lacking an interest in acquiring INMET's assets, from 2020 through early 2023, Defendants moved the necessary chess pieces into place to set up a fait accompli acquisition of INMET's assets. And they repeatedly schemed regarding ways to eliminate and subvert the royalty obligations owed to the Blackjewel Debtors:

- June 2020 – Mr. Sloan instructed Mr. Hobson to "settle 100% of the royalty for $[1.5] mm," but nobody could know that Defendants were involved, **Ex. 40** at D97134-35;
- July 2020 – Mr. Sloan told Mr. Hobson "to get in front of [Mr.] Beckman," "tell him [that INMET] lost leases," and "paint a dire picture," **Ex. 52** at D97289;
- July 2020 – Mr. Sloan told Mr. Freund that he "really want[ed] to figure out the royalty issue and whether it gets cleansed in BK," **Ex. 53** at D97332;
- July 2020 – Mr. Sloan instructed Mr. Hobson to tell Mr. Beckman that INMET was going to file for bankruptcy to pressure him to settle the royalty for pennies on the dollar, **Ex. 45** at D25251-52, which Mr. Hobson ultimately did, **Ex. 25** at 238:2-241:19;
- August 2020 – Mr. Sloan and Mr. Freund hatched a plan whereby they would remove Hobson from INMET, file INMET for bankruptcy, and then acquire its assets "free and clear from the royalty," **Ex. 44** at D97436;
- March 2022 – Mr. Hobson, per Defendants' instructions, spoke with Mr. Beckman, "painted a real desperate picture," and told him that INMET "had bankruptcy Council [*sic*] teed up for four months" and that he was concerned that Defendants were "just gonna drop the hammer… on [him]," **Ex. 54** at D98061; and
- Mr. Hobson testified that Defendants "encouraged [him] not to pay the royalty," **Ex. 25** at 418:16-424:13.

These discussions, which included Defendants' highest-level executives, demonstrate how focused Defendants were on interfering with Plaintiff's contractual rights.

### H. Defendants Manufacture Reasons To Remove Hobson from INMET.

As acknowledged by Mr. Freund, removing Hobson from INMET was an important part of Defendants' plan. **Ex. 44** at D97435. Thus, on January 26, 2023, Defendants accused Hobson

of embezzling INMET funds, which he vehemently denied. **Ex. 55** at D58153-54; **Ex. 25** at 259:9-262:16. Hobson testified that these accusations were "***part of [Defendants] plan to take [INMET] away from [him].***" *Id*. at 262:1-16 (emphasis added). On February 20, 2023, Defendants coerced Mr. Hobson into signing a forbearance agreement and membership pledge agreement "pledg[ing] [his] equity interest in [INMET's parent company, IMG] to BMMS." *Id*. at 282:19-285:16; **Ex. 56** at D85548-49; **Ex. 57** at D92270-80. Hobson signed these agreements because he "didn't feel like… [he] had too much of a choice," even though he denied Defendants' allegations.[10] **Ex. 25** at 287:4-14.

On March 26, 2023, Defendants used these agreements to remove Hobson from INMET and appoint Mr. Freund "as the sole manager and officer of IMG and member of IMG's board." **Ex. 58** at D83119-20. Notably, Mr. Freund, who had served as the Blackjewel Debtors' financial advisor and helped negotiate the Royalty Agreements, was now acting against the Blackjewel Debtors' interests on the Defendants' behalf.

### I. Defendants Force INMET to File for Bankruptcy and Challenge Whether the Royalty Agreements "run with the land."

On April 5, 2023, shortly after Defendants took control of INMET they had INMET file for bankruptcy. *See generally In re: INMET Mining LLC*, Bankr. Case No. 23-70113, at ECF No. 1 (the "INMET Bankruptcy Petition"). Importantly, INMET's bankruptcy petition identifies Jeff Strobel—the individual Defendants brought in to act as INMET's CFO—as INMET's Chief Restructuring Officer. *Id*. at 4 of 33; *see also* **Ex. 7** at 18:23-20:4 (Mr. Sloan testifying that Javelin selected Mr. Strobel to act as INMET's CFO before the bankruptcy filing).

---

[10] Ironically, *after* accusing Mr. Hobson of embezzlement, Defendants entered into an employment agreement with him pursuant to which he would be paid $500,000 for at least two years. **Ex. 59** at 1. Unsurprisingly, Defendants did not honor this agreement, and Mr. Hobson initiated an action, which is currently pending as *Charles Hunter Hobson v. Black Mountain Marketing and Sales, LP, et al.*, Case No. 3:23-cv-00374 (E.D. Tenn.).

In the year leading up to the bankruptcy filing, the amount that INMET allegedly owed to Defendants increased dramatically by more than $60 million despite improving coal market conditions. **Ex. 35** (Funding tab). Much of that debt was comprised of demurrage and other questionable fees. *Id*. at (Ancillary Costs tab). INMET's bankruptcy filings represented that Defendants were INMET's largest secured creditors, with INMET owing Defendants ***over $100 million*** in secured debt, *In re: INMET Mining, LLC,* 23-70113, ECF No. 22 at 9, and that Plaintiff also held the largest unsecured claim. INMET Bankruptcy Petition at 6. Although certain interested buyers contacted Defendants about INMET's assets, Defendants ***told prospective purchasers*** "***not to waste [their] time***" because Defendants were "credit bidding." **Ex. 60** at D95338-39 (emphasis added).

As reflected in the Bankruptcy Court's Order, the Defendants also threatened to contest INMET's use of cash collateral, further flexing their leverage and control. Mem. Op., *INMET Mining LLC v. Blackjewel Liquidation Tr.*, Adv. Proc. No. 23-7002 (Bankr. E.D. Ky. July 7, 2023) (the "INMET Adversary Proceeding"), ECF No. 69 at 6 ("***BMMS has not agreed to provide any more financing***, [] [INMET] is operating on cash collateral, [and] [t]he Plaintiff is struggling to continue full operations and its financial issues require week-to-week review") (emphasis added).

On May 1, 2023, as the final act of Defendants' scheme, Defendants caused INMET to file a complaint for declaratory judgment asking the Bankruptcy Court to declare "the portion of the Financing Agreement that purports to run with the land is invalid, impermissible, and unenforceable," INMET Adversary Proceeding, ECF No. 1 at 10 of 10, which it ultimately did, *id.* at ECF No. 69. And on July 13, 2023, Bluegrass Natural Resources LLC—an entity created by Defendant Javelin—credit bid the debt balance that Defendants had "run up" since mid-2020 and took direct ownership of INMET's most valuable assets, free and clear of the royalty obligations

owed to Plaintiff. *See In re: INMET Mining LLC*, Case No. 23-70113 (E.D. Ky. Bankr.) at ECF No. 536; at **Ex. 20** at 182:11-14.

## LEGAL STANDARD

Summary judgment is only proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits on file, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Seye v. Richardson*, 2015 WL 1868793, at *2 (E.D. Ky. Apr. 23, 2015) (quotations omitted). Defendants have the burden to "identify the portion of the record which demonstrates that there is no genuine issue of material fact," but the burden then shifts to Plaintiff to demonstrate "that there is a genuine issue for trial." *City of Pikeville v. Broan-Nutone, LLC*, 2016 WL 2843916, at *3 (E.D. Ky. May 10, 2016) (quotations omitted). "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows that a reasonable jury could return a verdict for the nonmoving party." *May for Estate of May v. Ford Motor Co*., 2011 WL 13234171, at *1 (E.D. Ky. Jan. 24, 2011) (internal quotations omitted). At the summary judgment stage, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Craig v. Bridge Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016) (internal quotations omitted). Moreover, "assertions in opposition to summary judgment 'need not themselves be in a form that is admissible at trial,' the fact remains that the party opposing summary judgment must show that it can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists." *Deere & Co. v. FIMCO Inc*., 239 F. Supp. 3d 964, 996 (W.D. Ky. 2018) (quotations omitted).

## LAW AND ARGUMENT

### I. WHETHER DEFENDANTS CAUSED INMET TO BREACH ITS CONTRACT WITH THE TRUST PRESENTS ISSUES OF FACT THAT CANNOT BE RESOLVED AT THE SUMMARY JUDGMENT STAGE.

At the outset, the Court should recognize that Defendants fail to contest that Plaintiff satisfies most of the elements of its claim for tortious interference. Mot. at 7-8. And Defendants do not even attempt to establish that their tortious conduct is justified because they "were pursuing their rational economic interests." *Id.* at 8 n. 5. Instead, they solely challenge causation and damages. *Id.* at 8-13. The Court should reject Defendants' arguments which mischaracterize Kentucky law and ignore the abundance of evidence that shows that Defendants spent years tortiously interfering with Plaintiff's contractual relationship with INMET.

### A. Defendants' Arguments Are Inconsistent with Kentucky Law and Ignore the Abundant Evidence of Their Tortious Interference.

Defendants' argument—based on cherry-picked evidence—that Plaintiff cannot prove that Defendants caused INMET to breach the Royalty Agreements must be rejected by the Court as inconsistent with Kentucky law. Kentucky law follows "the Restatement (Second) of Torts (1979) approach to tortious interference claims." *Sparkman v. Consol Energy, Inc.*, 571 S.W.3d 569, 571 (Ky. 2019); *see also Act for Health v. United Energy Workers Healthcare Corp*., 784 F. App'x 295, 303 (6th Cir. 2019) (same). And comment o. to the Restatement (Second) of Torts § 766 is clear: "***[t]he question whether the actor's conduct caused the third person to break his contract with the other raises an issue of fact***." (Emphasis added). Kentucky courts follow this principle. *See, e.g., Church Mut. Ins. Co. v. Smith*, 2017 WL 5987691, at *4 (W.D. Ky. Dec. 1, 2017) ("***a jury must decide*** whether the[] facts lead to the reasonable conclusion that CRA acted maliciously in causing Smith to breach his contract with Church Mutual") (emphasis added).

Courts in jurisdictions that follow the Restatement (Second) of Torts § 766, like Kentucky does, routinely reject causation-based arguments at the summary-judgment stage. For example, the defendant in *Genesis Telecommunications, LLC v. Moore* argued that the plaintiff could not prove that it caused the third party to breach its agreement with plaintiff because the third party's

"solicitation evidenced an independent inclination to breach its contract apart from any actions of the defendant." 2010 WL 6407918, at *9 (D.S.C. Oct. 18, 2010). While the court noted that this could create a "causation… problem with [the plaintiff's] claim," it ultimately held that "***'the question whether the actor's conduct caused the third person to break his contract with the other raises an issue of fact' not appropriate at summary judgment.***" *Id.* (emphasis added) (quoting Restatement (Second) of Torts § 766, *comment o.*).

Setting aside the fact that Defendants' request is contrary to applicable law, their argument misses the mark for another reason. Defendants simply argue that INMET did not have sufficient funds to make the royalty payments. Mot. at 10-11. However, INMET's precarious financial condition was created by Defendants' tortious conduct. For example, by manufacturing breaches of certain agreements to ultimately assert leverage over Mr. Hobson and his partners, Defendants directly precipitated INMET to pay higher default interest. **Ex. 27**; **Ex. 30** at D22290; **Ex. 32**; **Ex. 36** at 332:15-333:10. Indeed, when INMET filed for bankruptcy, it allegedly owed BMMS tens of millions of dollars in interest. **Ex. 35** (Funding tab). And Defendants also forced INMET to pay millions of dollars to hire consultants (Mr. Freund and Weir). **Ex. 46**; **Ex. 47**. Defendants also inundated INMET with tens of millions of dollars of questionable third-party fees, including demurrage charges, with no transparency. **Ex. 25** at 152:21-156:9; **Ex. 8** at 110:18-113:21; **Ex. 35** (Ancillary Costs tab). Defendants' own employees referred to these fees as "fucking insane." **Ex. 34**. And Defendants ran "up the prepay" debt to gain leverage in their dispute with NRP and to put themselves in a better position in the event of a bankruptcy—not to help INMET.[11] **Ex. 49** at D77114-16.

---

[11] Plaintiff anticipates that Defendants will argue that none of this conduct is tortious because Defendants took certain actions under the guise of their contractual rights. However, a tortious interference claim is actionable where a party uses its contractual rights to achieve an improper purpose, like Defendants did here. *See, e.g., Raheel Foods, LLC v. Yum! Brands, Inc.*, 2017 WL 217751, at *5 (W.D. Ky. Jan. 18, 2017) ("Plaintiffs do not allege that Defendants' mere

The record is clear that INMET had plenty of funding and assets to pay for expenses that the Defendants approved of. However, with respect to the royalty obligations, Hobson testified that the Defendants would not let him make these payments and micromanaged INMET's spending. Moreover, the record demonstrates that Defendants schemed for years about ways to eliminate or reduce the royalty obligations, instructed Hobson on what information he should and should not share with Mr. Beckman and the Blackjewel Debtors, and did not permit INMET to provide him with the financial information required under the Royalty Agreements. *See supra* at 8-14. This evidence, and the inferences that can be drawn from it, far exceeds what is required to withstand summary judgment.

Defendants' myopic focus on INMET's liquidity needs wholly ignores what precipitated that condition: Defendants' implementation of a plan to force INMET into a state of continual illiquidity, usurp the value of both Plaintiff's and INMET's interests in INMET's assts, plunge INMET into insolvency, and ultimately to realize the value in INMET's assets "free and clear of the royalty obligations." **Ex. 44** at D97436. It is clear that a core component of Defendants' plan was ensuring that INMET was financially dependent on Defendants so that they could control INMET's operations and ultimately call the shots. **Ex. 8** at 101:14-102:14; **Ex. 25** at 153:18-156:9. Defendants' Kafkaesque position that they should be able to skirt liability based on INMET's precarious financial condition—when they created that condition as part of their broader plan—should be rejected by the Court. Defendants' years of scheming to interfere with the Royalty Agreements should not be ignored by this Court.

---

denial of Non-Party Raheel Foods proposed sales was improper interference. The problem, as alleged by Plaintiffs, is that Defendants used their disapproval rights for an improper purpose—to take Plaintiffs' buyers for themselves… The fact that Defendants had the right to deny the sales proposed by Non-Party Raheel Foods is not fatal to Plaintiffs' claims."). And, of course, such arguments raise disputed issues of fact that cannot be resolved on summary judgment.

### B. Mr. Beckman's Testimony Is Admissible and, Even if It Were Not, Summary Judgment Would Still Not be Warranted.

Defendants assert that the Court should grant the Motion because Mr. Beckman's testimony that Mr. Hobson told him that Defendants would not allow INMET to comply with the reporting obligations is inadmissible hearsay. Mot. at 9-10. Defendants' argument, which should be rejected by the Court, is based on the faulty premise that Plaintiff must present direct evidence to prove that Defendants caused INMET to breach the reporting obligations (or violate other provisions of the Royalty Agreements). This is not so. Under Kentucky law, "[l]egal causation may be established by circumstantial evidence, and reasonable inferences drawn therefrom are permissible." *Stewart v. Galen of Ky.*, 2003 WL 1232081, at *1 (Ky. App. 2003); *Moore v. Lincks*, 2006 WL 1510634, at *2 (Ky. App. 2006) (a plaintiff can prove elements of its claim, "including causation, by circumstantial evidence").

Here, even without Mr. Beckman's testimony, there is ample circumstantial evidence from which a reasonably jury could find that Defendants caused INMET to breach the Royalty Agreements' reporting requirements, payment obligations, and other provisions. Such evidence includes that Defendants "micro manage[d]" and "control[led] communications that [Mr. Hobson] [was] having with third parties, like… the Blackjewel Debtors," and that Defendants told Mr. Hobson what he was supposed to say and what he was not supposed to say. **Ex. 8** at 114:21-116:18; **Ex. 40** at D97134-35; **Ex. 45** at D25251. Thus, even if Mr. Beckman's testimony is excluded—and it should not be for the reasons below—genuine issues of material fact exist regarding whether Defendants caused INMET to breach the Royalty Agreements' reporting obligations (and other provisions).

Moreover, Defendants' contention that Mr. Beckman's testimony is inadmissible lacks merit.[12] *First*, Mr. Beckman's testimony is admissible under Federal Rule of Evidence 804(b)(3)(A). "To qualify for this exception, a declarant must be 'unavailable," which includes having testified to "a lack of memory of the subject matter of the declarant's statement…" *BKCAP, LLC v. Captec Franchise Trust 2000-1*, 2011 WL 4916590, at *7 (N.D. Ind. Oct. 14, 2011) (quoting Fed. R. Evid. 804(a)(3)). This includes when a declarant does not recall a specific conversation. *Id*. During his deposition, Mr. Hobson did not deny making the statement at issue but repeatedly testified that he could not recall whether he made it, thereby making him unavailable under Rule 804(a)(3).[13] **Ex. 25** at 411:21-412:19, 423:1-24.

In addition, Mr. Hobson's statement was one that "a reasonable person in the [his] position would have made only if the person believed it to be true because, when made, it was so contrary to [Mr. Hobson's] proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability." Fed. R. Evid. 804(b)(3)(A). This hearsay exception "rests on the assumption that persons will not make damaging statements against themselves unless they are true." *Farr Man Coffee Inc. v. Chester*, 1993 WL 248799, at *17 (S.D.N.Y. June 28, 1993) (internal quotations omitted). By exclaiming "[t]hey won't let me," Mr. Hobson admitted that he had not provided the required information and was in breach of the Royalty Agreements, which "expose[d] him to civil liability for breach of contract." *Martinez v. One Beacon Am. Ins. Co*., 2020 WL 7016053, at *7 (D. Ariz.

---

[12] The specific testimony that Defendants seek to exclude can be found at **Ex. 1** at 143:1-144-22. Specifically, Mr. Beckman testified that Mr. Hobson told him that Defendants would not let him provide Mr. Beckman with the royalty reporting information. *Id.*

[13] *See also United States v. Rodgers*, 4 F.3d 995, at *3 (6th Cir. 1993) (table) ("Green testified that he did not 'remember everything that happened that night,'" which "qualifie[d] him as an unavailable witness under rule 804(a)(3)"); *Knight v. Henderson Int'l Technologies Inc*., 2016 WL 8257254, at *2 (E.D. La. Mar. 24, 2016) (because a witness "testified in his deposition that he [did] not recall any conversations with [certain individuals] about the Servomex modules or wires being switched," he was "by law[,] 'unavailable'").

Mar. 23, 2020) (holding statements were admissible because, in part, they "expose[d] [the declarant] to civil liability for breach of contract"); *see also 350 S. Los Angeles St. P'ship, L.P. v. Nationwide Mut. Ins. Co.*, 2024 WL 4328829, at *3 n.1 (C.D. Cal. Aug. 26, 2024). Accordingly, Mr. Beckman's testimony is admissible under Rule 804(b)(3)(A).

*Second*, Defendants unilaterally label Mr. Beckman's testimony as "self-serving," and then mischaracterize applicable law to argue that such testimony must always be excluded. Mot. at 9-10. However, in the Sixth Circuit, even if Mr. Beckman's testimony was self-serving (and it is not), "self-serving statements can create a genuine dispute of material fact to be resolved at trial." *Davis v. Gallagher*, 951 F.3d 743, 750 (6th Cir. 2020); *Issacs v. Brinker Int'l Payroll Corp.*, 2023 WL 4033485, at *4 (E.D. Ky. June 15, 2023) ("***the self-serving label does nothing to undermine the other side's evidence under Rule 56***" because "***self-serving statements can create a genuine dispute of material fact to be resolved at trial.***") (emphasis added). The only limitation on this principle—that the "testimony [that] is blatantly and demonstrably false… may not create a *genuine* issue of material fact"—is not at issue here. *Davis*, 951 F.3d at 750. Here, only Defendants' own "self-serving" testimony contradicts Beckman. Mr. Hobson, however, testified that he could have made that statement, but could not remember. **Ex. 25** at 423:1-24.

In sum, summary judgment is not appropriate because Plaintiff's tortious interference with the Royalty Agreements' claim is based on ample circumstantial evidence and direct evidence in the form of emails, text messages, and Mr. Beckman's testimony.

### C. Defendants' Argument That INMET Provided The Trust With Reports In 2022 Is a Red Herring.

In a last-ditch effort to avoid liability, Defendants argue that "INMET did, in fact, provide the Trust significant financial information in 2022, pursuant to a Non-Disclosure Agreement." Mot. at 10. However, the plain language of the Royalty Agreements dooms this argument. The

Royalty Agreements obligated INMET to "furnish to [the Trust] (or its designee) a report setting forth the gross production ***and fair market value of the operation***" "[w]ithin forty-five (45) days following the end of each calendar quarter until the Royalty has been paid in full." **Ex**. **3** at 2; **Ex. 4** at 2. Providing limited financial information in 2022 does not satisfy the Royalty Agreements' requirements. This is especially true because the information provided by INMET was historical financial information, and not the prospective financial information, including financial projections, required for INMET to comply with the requirement to set forth their evaluation of INMET's "fair market value." **Ex. 1** at 145:12-147:2. And, as Mr. Beckman testified, the limited information that was belatedly provided was largely useless and did not satisfy the Royalty Agreements' requirements. *Id.* The Court should thus disregard this argument.

## II. DEFENDANTS' CONDUCT CAUSED MILLIONS OF DOLLARS IN DAMAGES.

Although it is undisputed that INMET never made a single royalty payment to the Trust under either Royalty Agreement, Defendants now argue that the Trust "has no evidence that Defendants were the cause of any monetary damage incurred by the Trust." Mot. at 12. This argument lacks merit. The record reveals that Defendants encouraged Mr. Hobson not to make the Royalty Payments, then, ultimately, took control of INMET and forced it into bankruptcy to avoid the royalty obligations, thereby depriving the Trust of the economic benefits of the Royalty Agreements. *Supra* at 7-17. Moreover, Defendants repeatedly schemed regarding ways to interfere with the relationship between INMET and the Blackjewel Debtors and did not permit INMET to provide the sort of financial information that was required to analyze the value of the royalty streams. *Id.*; **Ex. 1** at 143:1-144-22.

Defendants also rehash the arguments advanced in their separate Motion to Exclude Ruby Barickman's testimony. Mot. at 12-13. Those arguments should be rejected for the reasons set

forth in Plaintiff's Opposition to Defendants' Motion to Exclude (ECF No. 55), and the arguments made therein are expressly incorporated herein. In short, and as set forth more fully in Plaintiff's Opposition, all of Defendants' arguments go to the weight of Ms. Barickman's testimony, not its admissibility. As discussed in Ms. Barickman's Expert Report, the value of the Royalty Agreements that the Defendants interfered with was between $8,191,415 and $14,191,986 as of September 7, 2020. ECF No. 49-2 at 14-15. Moreover, as of December 2022, the value of the payments under the Royalty Agreements that Defendants had not permitted INMET to make was $10,178,729. **Ex. 61**[14] (Royalty Valuation tab). Even if the Court were to ignore Ms. Barickman's opinions, which it should not, the evidence shows that the Defendants prevented INMET from paying Plaintiff more than $8.7 million under the two Royalty Agreements through December 31, 2022.

## III. PLAINTIFF'S CIVIL CONSPIRACY CLAIM SHOULD NOT BE DISMISSED.

Defendants' only argument regarding the civil conspiracy claim is that it fails because they are entitled to summary judgment on Plaintiff's tortious interference claim. Mot. at 13-14. Since, as shown above, the tortious interference claim survives summary judgment, the Motion should be denied with respect to the civil conspiracy claim. *GreenCity Demo, LLC v. Wood Environmental & Infrastructure Solutions, Inc.*, 2021 WL 278302, at *6 (W.D. Ky. Jan. 27, 2021) ("because the Court has not dismissed the tortious interference claims, the Court declines to dismiss the civil conspiracy claim…").

## CONCLUSION

For the foregoing reasons, the Court should deny the Motion in its entirety.

[14] A native version of this Excel spreadsheet will be provided to the Court.

DATED: August 4, 2025

**SQUIRE PATTON BOGGS (US) LLP**

/s/ *F. Maximilian Czernin*
F. Maximilian Czernin (KY 93674)
S. Chad Meredith (KY 92138)
Squire Patton Boggs (US) LLP
Cincinnati, Ohio 45202
Tel: (513) 361-1200
Fax: (513) 361-1201
Max.Czernin@squirepb.com
Chad.Meredith@squirepb.com

Gregory C. Djordjevic
*(admitted pro hac vice*)
Squire Patton Boggs (US) LLP
1000 Key Tower
127 Public Square
Cleveland, Ohio 44114
Tel: (216) 479-8106
Fax: (216) 479-8780
Gregory.Djordjevic@squirepb.com

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 4, 2025, a copy of the foregoing was filed with the Court and will be served on all counsel via the Court's electronic filing system.

/s/ *F. Maximilian Czernin*
F. Maximilian Czernin (KY 93674)